STATE of Minnesota, Respondent,

v.

Anthony J. HICKS, Appellant.

No. C5–85–742.

Court of Appeals of Minnesota.

Feb. 4, 1986.

Hubert H. Humphrey, III, State Atty. Gen., Thomas Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Elizabeth B. Davies, Spec. Asst. Pub. Defender, Minneapolis, for appellant.

Considered and decided by SEDGWICK, P.J., and RANDALL and CRIPPEN, JJ., with oral argument waived.

## OPINION

SEDGWICK, Judge.

Anthony Hicks appeals from a conviction of first degree burglary in violation of Minn.Stat. § 609.582, subd. 1(a) and subd. 1(c) (1984) and simple robbery in violation of Minn.Stat. § 609.24 (1984). We affirm.

## FACTS

On August 21, 1984, Elaine Saari was seated in the kitchen of her Minneapolis home when she noticed a man at the door. When she approached the door, the man said his wife was hurt and asked for a blanket. She tried to close the inner porch door but the man pushed his fist through the screen door, knocking Saari off balance.

Saari began screaming in an attempt to alert her neighbors. Saari continued to scream although the man threatened to kill her if she didn't "shut up."

The man took $5.00 from her billfold. As he rummaged through her purse, Saari ran screaming out of her house into the front yard.

Marshal Bradley, Saari's neighbor testified she heard a call for help, looked outside her window and saw a man cut through the screen door, open the door, and enter Saari's house. She said she also heard the man tell Saari to shut up and saw Saari "fly past the window" as if pushed or shoved. She told her friend to call the police. When Saari ran out the front door, Bradley joined her. Bradley then saw the man run out of Saari's side door. Bradley

estimated the entire incident took place in 2 to 3 minutes.

Another neighbor, Robert Burkhardt, heard Saari's screams and dialed the 911 number. He saw a black man run from the side door of Saari's home. 911 records show this call was made at 9:30 a.m.

A third person, Sidney Moore, was at a nearby apartment building when he saw Saari run from her house. Saari told Moore what happened and he ran into her house to look for the man. He then ran out the front door and to the next street where he saw the rear end of a white car traveling south but couldn't see the license. At trial Moore viewed a photograph of appellant's car. He said the tail lights were different from those of the car he saw.

About five minutes after this incident, a man, later identified as appellant, wearing designer blue jeans and no shirt and described as being "real sweaty" and "real excited," walked into the outer office of Warning Lites, a nearby business. Virginia Metzger, one of three women working in the outer office, asked if she could help him. The man told her he wanted "to talk to a man." He walked through a gate into an office behind Ms. Metzger, turned, and jumped back over the gate.

Metzger saw him get into a "big white car" on the driver's side. She testified she got a good look at the man, and the license number of the car, EUJ 439.

After consulting with others in the office, Metzger gave the license plate number, description of the car, and a description of the man to police. The records for the 911 number show this call was received at 9:35 a.m.

Police Officer George Florest, received a report that a white Cadillac, license number EUJ 439 was involved in an incident on the north side at approximately 11:00 a.m. Florest and his partner spotted the car at the intersection of Cedar and Washington and stopped it. Florest identified appellant as the driver.

Police arrested appellant. After being advised of his *Miranda* rights, appellant said that his car had been stolen that morning between 9:00 and 10:00 while he was in Joe's Bar on Broadway in Minneapolis. He called the 911 emergency number to report his car as stolen. The 911 emergency number records show that call was received at 9:54 a.m.

Sharon Casey, the bartender working at Joe's Bar that morning, identified appellant as the man who had come into the bar at 11:00 a.m. and used the telephone. Appellant admitted that the 911 operator gave him the number to call the police auto desk, but he did not call that number. Instead he said a friend gave him a ride home to get his extra set of keys. When appellant and his friend returned to the north side they saw Hicks' car parked about eight blocks from Joe's Bar.

Saari identified appellant's photograph from an eight-picture photo array. She also identified Hicks at trial as the man who entered her home on August 21, 1984 and took her money. Bradley was unable to identify appellant either from photos or at trial. Burkhardt identified appellant in a lineup as the man he had seen leaving Saari's home on the morning of August 21, 1984.

Metzger, one of the women at Warning Lites, identified appellant from a photo lineup as the man who had been in the business on August 21, 1984.

Police determined that the distance from Saari's residence to Warning Lites was approximately four-tenths of a mile and took about a minute and a half to drive. It is approximately a mile and a half from Warning Lites to Broadway Joe's Bar.

Following an omnibus hearing, the court ruled that all identification evidence would be admitted, and that Hicks' prior convictions could be used for impeachment purposes if he testified. After the trial began, the prosecutor became ill and the trial court granted defense counsel's motion for a mistrial. The court denied appellant's motion to bar retrial.

## ISSUES

1. Is retrial of appellant following a mistrial barred by double jeopardy?

2. Were pre-trial identification procedures impermissibly suggestive?

3. Is the evidence sufficient to sustain appellant's conviction?

4. Did the trial court err in ruling that appellant's prior convictions could be used for impeachment purposes?

## ANALYSIS

1. Both the United States and the Minnesota Constitutions contain a prohibition against prosecuting a defendant twice for the same crime. U.S. Const. Amend. V; Minn. Const. Art. I, § 7. Courts have held that generally jeopardy attaches once a jury is impaneled. *State v. McDonald*, 298 Minn. 449, 452, 215 N.W.2d 607, 609 (1974).

 However, if jeopardy attaches and defendant requests a mistrial the state may retry the defendant unless the prosecutor intentionally provoked the mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *State v. Gwara*, 311 Minn. 106, 108, 247 N.W.2d 417, 419 (1976). In analyzing whether the double jeopardy clause bars retrial, courts must consider whether the request was prompted by bad-faith intentional misconduct on the part of the prosecutor designed to thwart defendant's chances of acquittal. *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *Gwara*, 311 Minn. at 108, 247 N.W.2d at 419.

 In this case, there are no acts to support a finding that the prosecutor had any intention to provoke a mistrial. He became ill, a circumstance characterized by the trial court as an "act of God." Based on the standards set forth in *Oregon v. Kennedy*, the mistrial caused by the prosecutor's illness does not bar Hicks from being retried.

2. Appellant argues that the photo array viewed by Saari was impermissibly suggestive because he could be easily distinguished from the seven individuals in the display. Hicks also disputes the reliability of the in-person lineup where Burkhardt identified him as the man he saw run from Saari's home. He claims Metzger's identification of him is tainted because he did not look like the seven other persons in the photo array and she only confronted the man in Warning Lites for a few seconds.

 The test to determine whether a conviction based on eyewitness identification following a photo display should be set aside is whether "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). If the identification procedure was suggestive, the court must consider the following factors in evaluating the likelihood of misidentification:

1. The opportunity of the witness to view the criminal at the time of the crime,

2. The witness' degree of attention,

3. The accuracy of the witness' prior description of the criminal,

4. The level of certainty demonstrated by the witness at the confrontation,

5. Length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). *See also State v. Jackson*, 365 N.W.2d 777, 778–9 (Minn.Ct.App.1985).

 Saari saw Hicks for several minutes and her full attention was on him during that time. She saw the photo display only one day after the robbery. There was sufficient similarity of facial characteristics in the photos to permit the display. Further the incident took place in daytime when the lighting was good.

Saari's identification was corroborated by Metzger and Burkhardt. Both identified Hicks; Burkhardt from an in-person lineup and Metzger from a photo array. Metzger had ample time to view the man at Warning Lites. She saw him enter the

business, run out of the door and she followed him to his car. Although she consulted with co-workers before giving a description to the 911 dispatcher, her identification of Hicks is not defective.

Even though Burkhardt did not view Hicks for as long as Saari, he chose him from a lineup. There is no evidence that the procedure followed here was so suggestive as to create a "very substantial likelihood of irreparable misidentification." *See Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 381–82.

3. In reviewing a claim of insufficient evidence in a criminal matter, the court must view the evidence in the light most favorable to the state and determine whether, under the evidence contained in the record, a jury could reasonably find the defendant guilty of the crime charged. *State v. Brouillette,* 286 N.W.2d 702, 705 (Minn.1979). The court must assume the jury believed the state's witnesses and disbelieved any contradictory evidence. *Id.*

In this case, a jury determined that Anthony Hicks was the man who burglarized Elaine Saari's home and assaulted her. Hicks contends that the eyewitnesses who identified him were mistaken.

 The general rule in Minnesota is that a witness must have an opportunity for accurate observation; *State v. Gluff,* 285 Minn. 148, 151, 172 N.W.2d 63, 65 (1969); and adequate circumstantial evidence connecting the defendant with the crime should be present. *See State v. Kinderman,* 271 Minn. 405, 408, 136 N.W.2d 577, 579, *cert. denied,* 384 U.S. 909, 86 S.Ct. 1349, 16 L.Ed.2d 361 (1966). However, there is no statutory or constitutional requirement for corroboration of a complainant's testimony. *State v. Burch,* 284 Minn. 300, 313–14, 170 N.W.2d 543, 552 (1969). Factors such as the witness' condition and time for observation, go to weight given the testimony, not its admissibility. *Id.*

 The evidence here consists of: 1) Saari's identification of the man who forced his way into her home based on her face-to-

face observation that morning; 2) her neighbor's identification based on seeing the man from a distance of 15–25 feet; and 3) Metzger's identification of Hicks as the man involved in an incident at a business near Saari's home.

Viewing the facts of this case in the light most favorable to the state, it's clear that Saari had adequate opportunity to deliberately observe Hicks. They were face-to-face for several minutes during the robbery and attack. She chose his picture from a photo array and also identified him at trial. Although Burkhardt only saw appellant briefly, he did choose appellant from a lineup. Metzger further corroborates Saari's and Burkhardt's testimony by placing him in the vicinity of Saari's home at the time of the robbery. The fact that one of the eyewitnesses was unable to identify Hicks as the man involved in the robbery, does not mean he is innocent. It only indicates uncertainty on the part of that particular witness.

Appellant claims his lack of a five dollar bill—the amount taken from Saari—is indicative of his innocence. Hicks was arrested about two hours after the offense. He testified he had gone home just prior to his arrest and a bartender said he had been at the bar about 11 a.m. Hicks had numerous opportunities to dispose of the five dollar bill.

Applying the relevant standard of review, it is clear the jury found the eyewitnesses testimony to be accurate and disbelieved any contradictory evidence.

4. Admissions of prior convictions to impeach a defendant's credibility if he testifies are governed by Minn.R.Evid. 609(a), which provides:

(a) **General rule.** For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if * * * established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year * * * and the court determines that the probative value of

admitting this evidence outweighs its prejudicial effect * * *.

(b) **Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction * * *.

Hicks' prior convictions for burglary and first degree criminal sexual conduct were eight years old and he had been imprisoned part of that time, thus they were still available for use under the rule. On appeal a trial court's evidentiary rulings must be affirmed unless a clear abuse of discretion is shown. *See State v. Jones,* 271 N.W.2d 534 (1978).

In determining whether to restrict evidence of a prior conviction as more prejudicial than probative, a trial court should consider such facts as: (1) the impeachment value of the prior crime, (2) the date of the conviction and defendant's subsequent history, (3) the similarity of the prior conviction with the charged crime, (4) the importance of the defendant's testimony, and (5) the centrality of the credibility issue. *Id.* at 538.

The record before us does not disclose whether or not the standards of *Jones* were addressed. The court which considered the omnibus issues was not the trial court. The omnibus judge simply denied, without comment, the motion to suppress prior convictions. We do note, however, that the chilling effect of using the prior convictions if Hicks took the stand was not the same as it was in *Jones* where defendant's version of the shooting was not presented because of the threat of impeachment. Here, Hicks' theory that someone else stole his car and committed the offense was before the jury notwithstanding his election not to take the stand.

In *State v. Brouillette,* 286 N.W.2d 702 (Minn.1979), the supreme court held that a defendant's prior conviction for third degree criminal sexual conduct is admissible to impeach him upon his testifying because it was "probative of his truthfulness." *Id.* at 708.

## DECISION

The trial court did not err in admitting identification testimony or in ruling that appellant's prior convictions could be used to impeach him if he took the stand. The trial court's grant of appellant's motion for mistrial did not prevent his retrial. The evidence was sufficient to sustain the conviction. Affirmed.